# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **No. 3:09cr320** |
| | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **ADOLPHUS MCNEIL,** | : | |
| **Defendant** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Before the court are defendants' motions to suppress evidence (Docs. 19, 48).

**Background**

October 13, 2009, a grand jury in the United States District Court for the Middle District of Pennsylvania returned an indictment naming the defendant on six counts. Count I accuses the defendant of engaging in a conspiracy to distribute and possession with intent to distribute in excess of one hundred kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). Count II charges defendant with violating 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 by possessing marijuana with intent to deliver. Count III alleges that defendant used a communications facility in the commission of a felony under the Controlled Substances Act in violation of 21 U.S.C. § 843(b). Count IV charges defendant with possession of a firearm while being an unlawful user of controlled substances in violation of 18 U.S.C. § 922(g)(3). Count V contends that defendant violated 18 U.S.C. § 924(c) and 18 U.S.C. § 2 by using a firearm in furtherance of drug trafficking crimes. Count VI seeks forfeiture of

property used in the alleged crimes pursuant to 21 U.S.C. § 853.

Defendant filed the instant motion to suppress his statements on December 17, 2009.  He filed the instant motion to suppress evidence on January 6, 2010.  On January 7, 2010 the court held an evidentiary hearing on these motions.  At the end of that hearing the court denied the defendant's motions.  This memorandum explains the reasons for those decisions.

## Discussion

Defendant seeks suppression of any statements obtained from him during a traffic stop on April 12, 2008.  Additionally, defendant seeks suppression of any physical evidence and statements seized from the April 12, 2008 search of 90 Penn Ave, Kingston, PA and 97 Metcalf, Wilkes Barre PA, obtained, directly or indirectly, as a result of any unlawfully warrantless search, an invalid search warrant, failure of law enforcement to provide a copy of the search warrants to the defendant and fruit of the poisonous tree.

This case surrounds an investigation of drug trafficking in the Wilkes-Barre, Pennsylvania area.  The events that led to the instant motions occurred on April 11-12, 2008.  On April 11, 2008, Illinois State Police stopped a car loaded with seventy pounds of marijuana in that state.  An interview with the driver revealed that he had arranged to deliver the drugs to Steve McNeil, defendant's brother, in Wilkes-Barre Pennsylvania.  An investigation discovered that McNeil had connections to the two homes that were the subject of the searches here at issue.  Police arranged a

controlled delivery of the drugs to Steve McNeil the next day. They also prepared to obtain and execute search warrants at both houses. The evidence seized in those searches is the subject of these motions.

### a. Defendant's Statements

Defendant seeks suppression of any statements he made to police during a traffic stop on April 12, 2008. He contends that he was in custody at the time he made his statements. Since the statements were made without the benefit of <u>Miranda</u> warnings or the presence of counsel, they should be suppressed. The government argues that defendant was not arrested, but merely subjected to a routine traffic stop or an investigatory stop. Since the law is well-settled that a person detained for a traffic stop or an investigatory stop is not in custody for <u>Miranda</u> purposes, the statements should not be suppressed.

Trooper William Langman testified at the hearing on these issues. (Transcript of Proceedings Held January 7, 2009 (hereinafter "N.T.") at 52-61). Langman reported that at the time of the events in question, he had been a Trooper for fifteen years. (<u>Id.</u> at 53). On April 12, 2008, Langman worked as a narcotic dog handler and was summoned to Troop P in Wyoming, Pennsylvania for a meeting on the case. (<u>Id.</u>). After the meeting, Langman traveled to the Penn Avenue home in Kingston in his marked car to assist after Steve McNeil's arrest. (<u>Id.</u>). At some point thereafter, Langman was dispatched to the Metcalf Street address. (<u>Id.</u> at 54). Langman arrived at that residence and noticed that surveillance had been set up by

3

other officers.  (Id.).  He soon heard a report over his police radio that Adolphus

McNeil was leaving the residence.  (Id.).  He was directed to stop the car.  (Id.).  The

order came by radio and relayed that Adolphus McNeil lacked a driver's license.  (Id.

at 55).  Langman stopped McNeil's car, got out of his own vehicle, and approached

McNeil's car to ask to see his driver's license.  (Id.).  Langman did not recall whether

McNeil actually had a license, and could not recall whether he asked for or procured

any identifying information from the defendant.  (Id. at 56, 59).  At that point, Drug

Enforcement Agency ("DEA") Agents approached the car.  (Id. at 56).  Langman

moved his car, which was behind McNeil's vehicle, to the opposite side of the street.

(Id.).  He stayed with the car while the agents spoke with McNeil.  (Id.).  Langman

testified that he never placed McNeil in handcuffs, drew his gun, or placed McNeil in

a police car.  (Id.).  He also testified that the stop took place on a busy street in the

City of Wilkes-Barre.  (Id.).  Langman never issued McNeil a citation, and did not

have further contact with him.  (Id. at 57).

    Willliam Langan, a Special Agent with the DEA working out of Scranton,

Pennsylvania, also testified.  (Id. at 61-70).  He reported that on April 12, 2008 he

had been assigned to surveillance at 97 Metcalf Street in Wilkes-Barre

Pennsylvania, one of the two houses connected to Steve McNeil and a place where

he might be expected to bring the marijuana he received in the controlled delivery.

(Id. at 61).  Police, Langan testfied, had information that tied Steve McNeil to the

residences at Penn Avenue and Metcalf Street and had staked out both residences

4

because they were unsure where he planned to bring the marijuana he would receive. (Id. at 62-3). After Steve McNeil's arrest, Langan traveled to the home on Penn Avenue, noted the large police presence there, and returned to 97 Metcalf Street. (Id. at 63). He noticed a green S.U.V. on a side street near the house. (Id.). A young girl exited the car. (Id.). Langan drove around the corner. (Id.). When he returned, the S.U.V. was gone. (Id.). On his police radio, Langan heard that the car had been stopped in the area of East North Hampton Street and Park Avenue in Wilkes-Barre, PA. (Id. at 64).

Langan stopped his vehicle near where Langman stopped McNeil. (Id. at 64). He remained in the car. (Id.). At some point, Adolphus McNeil walked on foot to Langan's car, accompanied by an unidentified DEA agent or agents. (Id. at 64, 69). Langan remained in the vehicle because he had injured his knee. (Id. at 64). When defendant walked up to the car, Langan told him that police were obtaining a search warrant for the home at 97 Metcalf. (Id.). He asked defendant if there were any drugs, guns or large sums of money in the home. (Id.). Defendant replied that there was marijuana in the house, for personal use. (Id.). When asked how much, defendant told Langan that there was about half a pound of marijuana there. (Id.). Langan testified that defendant was not in handcuffs at the time he made this statement. (Id.). No one, as far as Langan recalled, had told defendant he could not leave. (Id. at 65). Defendant had not been placed in a patrol car, but made his statement on a public street while Langan sat in his car. (Id.).

5

The Supreme Court has held that the Self-Incrimination Clause of the Fifth Amendment "[bars] the introduction in federal cases of involuntary confessions made in response to custodial interrogation." Withrow v. Williams, 507 U.S. 680, 688 (1993). Courts have found that "a statement is involuntary when the suspect's 'will was overborne in such a way as to render his confession the product of coercion.'" Choi Chi Lam v. Kelchner, 304 F. 3d 256, 264 (3d Cir. 2002). There is no dispute here that defendant was not advised of his rights before he made his statement. At issue, however, is whether defendant was actually in custody when he spoke with police after the traffic stop. "[C]ustodial interrogation" is "'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" Oregon v. Mathiason, 429 U.S. 492, 494 (1977) (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Though the Third Circuit Court of Appeals has held that normally "the principles of Miranda have been held not to apply to the traffic stop context" United States v. Anderson, 859 F.2d 1171, 1177 (3d Cir. 1988), the Supreme Court has found that "[i]f a motorist [who] has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." Berkemer v. McCarthy, 468 US. 420, 440 (1984); see also, United States v. Elias, 832 F.2d 24, 26-27 (3d Cir. 1987). The court must therefore inquire into "how a reasonable man in the suspect's position would have understood his situation" to determine whether

6

the traffic stop constituted a routine stop or at some point transformed into a situation where defendant was "in custody" for Miranda purposes. Berkemer, 468 U.S. at 441. "[T]he safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtained to a 'degree associated with formal arrest.'" Id. at 440 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)).

The court finds that defendant was not in custody for the purposes of Miranda at the time he made his statement to Agent Langan. Though plaintiff had been stopped by police, he had not been told he was in custody, had not been placed in handcuffs or told to sit inside a police cruiser. No officer had drawn his gun. The events occurred on a public way, shortly after Langman stopped defendant's car. Moreover, defendant made his statement to Agent Langan as he stood on the street and Langan sat in his car. Such facts do not represent a situation where defendant was held "to 'a degree associated with formal arrest.'" Berkemer 468 U.S. at 440.

Defendant also contends that the stop made by police was merely pretextual, serving as an opportunity to question defendant about the underlying investigation. Officers stopped defendant not because he lacked a driver's license, but because they suspected he was involved in a narcotics trading operation. The evidence indicates, however, that police were aware that Adolphus McNeil lacked a drivers license. Police thus had probable cause to stop McNeil when they saw him driving. That their real reason for the stop may have been related to the drug investigation is of no import to the legality of the stop itself. See Whren v. United States, 517 U.S.

806, 813 (1996) (finding that case law "foreclose[s] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved . . . Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). Indeed, "a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of Miranda." Stansbury v. California, 511 U.S. 318, 324 (1994). The court has concluded that Adolphus McNeil was not in custody when he made his statements to police, and the court will deny the plaintiff's motion on these grounds.

### b. The Search Warrant at 90 Penn Avenue

Defendant challenges the validity of the search and the search warrant executed at 90 Penn Avenue in Kingston, Pennsylvania on April 12, 2008. At the evidentiary hearing held by this court on January 7, 2010, Pennsylvania State Police Trooper James Hischar testified about the investigation that led to the search of this residence. (N.T. 6-30). Hischar was assigned to the Drug Enforcement Administration in Scranton, Pennsylvania and worked on the investigation that led to defendant's arrest. (Id. at 6).

Hischar testified that on April 11, 2008, Illinois State Police stopped a vehicle which they found contained in excess of seventy pounds of marijuana. (Id. at 7). An occupant of the vehicle told police that he was transporting the marijuana to Steve McNeil, who lived in Wilkes-Barre Pennsylvania. (Id.). The occupant agreed to

cooperate with police and conduct a controlled delivery of the marijuana.  (Id.).

Hishar reported that the Illinois State police transported the two occupants of the car, a husband and wife, the marijuana and the car to Pennsylvania.  (Id.).  While police transported this car, Hischar and other officers conducted an investigation of Steve McNeil, who lived with his brother, Defendant Adolphus McNeil, at 97 Metcalf Street in Wilkes Barre, Pennsylvania.  (Id.).  Once the witnesses, the car and the marijuana arrived in Pennsylvania, police arranged with the now-cooperating witnesses to make telephone calls to Steve McNeil to arrange to drop off the marijuana.  (Id. at 8).  Unable to reach Steve McNeil by cellular telephone, police had the witnesses call the 97 Metcalf Street residence.  (Id.).  They spoke with Adolphus McNeil.  (Id.).  Adolphus McNeil agreed to go to the 90 Penn Ave. residence and inform his brother that the witnesses sought him.  (Id. at 9).  Steve McNeil soon called the witnesses and arranged to take delivery of the marijuana. (Id.).

Hischar testified that Trooper Scott Hawley of the Pennsylvania State Police worked to prepare search warrants for the two homes here in question while the investigation was ongoing.  (Id. at 15).  Hawley assembled affidavits while troopers prepared to make the controlled delivery of marijuana and arrest Steve McNeil. (N.T. at 15).  Hawley used information from this investigation in preparing the warrants, and remained in the "barracks at the typewriter with the warrants ready to go, to type them and give us whatever support we needed."  (Id.).  Police planned to

9

follow Steve McNeil after he obtained the marijuana to determine the "stash location" where he placed the drugs. (Id.).

As part of their investigation, State Troopers had discovered that the Steve McNeil's girlfriend, Colleen McDaniels, and several of their children lived in the residence at 90 Penn Avenue. (Id. at 14). Steve McNeil paid the rent at the home, but the lease, utilities bill and anything else connected to the residence were in Colleen McDaniels's name. (Id.). Officers concluded that Adolphus McNeil did not live at 90 Penn Avenue, but instead lived at 97 Metcalf. (Id. at 14-15). An interview with the cooperating witnesses indicated that defendant and his brother lived at 97 Metcalf Street and that Steve McNeil would sometimes stay with his girlfriend at 90 Penn Avenue. (Id. at 16).

Police eventually observed Steve McNeil taking delivery of the marijuana. (Id. 9). Officers followed him to the home at 90 Penn Avenue. (Id. at 10). When McNeil arrived at that home and exited the car, Hischar walked up to McNeil and informed him he was under arrest. (Id.). Hischar placed McNeil in an unmarked police car and began talking with him. (Id. at 12). He explained the reasons for McNeil's arrest and why officers were at the home. (Id. at 13). He asked McNeil whether he wanted to talk about the incident, and McNeil agreed to do so. (Id.). Hischar then read McNeil his Miranda warning and had him sign a waiver. (Id.; see Gov't's Exh. 2). McNeil signed and dated the waiver at 7:10 p.m. on April 12, 2008. (Exh. 2). Hischar also asked McNeil if he consented to a search of his home. (N.T. at 25).

Hischar had information from state troopers who spoke with McNeil's girlfriend, who lived in the home, that she had consented to a search. (Id. at 25). Following the advice of a local district attorney, officers decided to delay the search until they had a search warrant. (Id.).

Hischar reported that when police arrested Steve McNeil, Colleen McDaniels came out of the home at 90 Penn Avenue "to see what was going on." (Id. at 24). Troppers spoke with her on the home's front porch. (Id. at 26). Pennsylvania State Police Trooper Jeffrey Lamm also testified at the hearing. (Id. at 30-38). Lamm reported that he had been employed by the State Police for ten years, and that his present assignment was with the Troop P. Wyoming Vice Narcotics Unit. (Id. at 30-31). He was present when Hischar arrested Steve McNeil. (Id. at 31). The arrest created a "commotion" in a "quiet neighborhood." (Id.). Neighbors, as well as Colleen McDaniels, came out of their houses to inquire at what was occurring in the front yard of 90 Penn Ave. (31-32). Two other officers, Trooper Lisa Brogan and Corporal Minsavage, went onto the home's front porch and spoke with McDaniels. (Id. at 32). They eventually went inside the house with McDaniels. (Id.). Lamm did not see the troopers draw their guns or force their way into the home. (Id. at 32). Lamm stayed outside for a time, ensuring that "everything was staying calm." (Id.). After about five minutes, he entered the house to find Corporal Minsavage and Trooper Brogan in the living room directly inside the front door. (Id.). They were seated on the couch speaking with McDaniels. (Id.).

11

Lamm at some point joined the conversation, explaining to her "what was happening outside with Steve" in Trooper Hischar's car.  (Id. at 33).  Lamm and the other Troopers explained the case to McDaniels, and Lamm asked for permission to look around the home.  (Id.).  McDaniels agreed, but Troopers decided not to make a search.  (Id.).  The Troopers did ask McDaniels if there was anything illegal in the residence, and she admitted that Steve McNeil had left marijuana on the kitchen table.  (Id.).  According to Trooper Lamm, McDaniels voluntarily went to the kitchen and retrieved the marijuana.  (Id.).  She gave it to Lamm.  (Id.).  Shortly thereafter, Lamm left to assist in surveillance at the house on 97 Metcalf.  (Id. at 34).

State Trooper Michael Minsavage also testified.  (Id. at 38).  Minsavage was a corporal and served as supervisor of the Troop P. Vice and Narcotics Unit.  (Id. at 38-39).   Minsavage arrived at 90 Penn Ave. approximately two to three minutes after officers took Steve McNeil into custody.  (Id. at 39).  He arrived together with trooper Lisa Brogan.  (Id.).  When they came to the residence, they found Colleen McDaniels and several children on the porch.  (Id.).  There was a commotion at the scene.  (Id. at 39-40).  Minsavage and Brogan walked up onto the porch to explain the situation to her.  (Id. at 40)  Noting that many of her neighbors had come out into the street, McDaniels invited the officers into the home "so as not to make a spectacle in the neighborhood."  (Id.).  Minsavage testified that he and Brogan did not draw their guns, kick the door in, or force their way into the home.  (Id.).

Once inside the home, they spoke with McDaniels.  (Id. at 40-41).  She

appeared "very excited" and "scared" because of the police cars in the area and the "commotion" they caused. (Id. at 41). The troopers explained to McDaniels why McNeil had been stopped, and told her that they were aware that McNeil had been driving a car registered to her. (Id.). McDaniels told police that she was McNeil's girfriend and that she had leased the property on Penn Avenue for the past two years. (Id.). All of the bills related to the property were in McDaniels's name. (Id.). Minsavage testified that the troopers did not perform any search of the residence during this time. (Id. at 42). He reported, however, that McDaniels denied she knew of any marijuana trafficking by Steve McNeil, but admitted she knew he had smoked marijuana in the past. (Id.). She also told troopers that there was a bag of marijuana on the kitchen table, and went and retrieved it. (Id. 42-43). Minsavage reported that McDaniels consented to a search of the home. (Id. at 43). Acting on the advice of Assistant District Attorney Tim Doherty, however, the troopers decided to wait until they obtained a search warrant. (Id. at 43). Minsavage participated in the search that occurred after police obtained a warrant. (Id. at 46). They discovered a large duffle bag containing several pounds of marijuana. (Id.).

Defendant argues that the evidence seized pursuant to Penn Avenue search should be suppressed because officers violated the Fourth Amendment in obtaining it. The officers, he contends, executed their search before they obtained a warrant. "The Fourth Amendment guarantees: 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,

13

shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'" Minnesota v. Carter, 525 U.S. 83, 88 (1998).  As such, "[t]o search a person's home and belongings, police officers ordinarily must first seek a warrant based on probable cause supported by oath or affirmation.  Warrantless searches are presumptively unreasonable under the Fourth Amendment."  Parkhurst v. Trapp, 77 F.3d 707, 711 (3d Cir. 1996).  Of course, "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).

Defendant argues that the exclusionary rule would apply here if the search was warrantless.  "The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search."  Murray v. United States, 487 U.S. 533, 536 (1988).  Defendant also argues that the "fruit of the poisonous tree" doctrine should apply, preventing the government from introducing "derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" Id. at 536-37 (quoting Nardone v. United States, 308 U.S. 338, 341 (1939)).

In this case, the evidence indicates that a search did not occur before officers obtained a warrant. Though the application for a warrant contained information about evidence obtained from inside the home at 90 Penn Ave., testimony from the hearing indicates that Colleen McDaniels voluntarily provided officers with this marijuana after they asked her if there were any drugs in the residence. She also consented to a search of the residence, and the evidence indicates she resided in that home.[1] All of the testimony collected at the hearing indicates that this single bag of marijuana was the only evidence collected from the home at 90 Penn Ave. before officers obtained a warrant. Defendant also points to evidence that before the grand jury Hischar testified that officers were watching the 97 Metcalf address while they searched 90 Penn Ave. (N.T. at 77). This evidence does not indicate, however, that police searched the house on Penn Ave. without a warrant; it simply demonstrates that they searched the Penn Ave. house while they were watching the Metcalf address. As such, no evidence indicates that a warrantless search occurred at the

---

[1]Defendant recalled Hischar at the evidentiary hearing and adduced evidence that Hischar had testified before the grand jury that neither Colleen McDaniels nor Steve McNeil had consented to the search at 90 Penn Ave. (N.T. at 77). Hischar explained that he had assumed that Colleen McDaniels had not consented to the search, since officers obtained a warrant. (Id.). He also explained that he had not been present when McDaniels allegedly consented to the search. (Id.). Joseph Coffay, a Wilkes-Barre Police Officer, similarly testified that he told a grand jury that Colleen McDaniels and Steve McNeil had not consented to the search. (Id. at 80). He was likewise not present when the consent allegedly occurred; his assignment that day was to guard the cooperating witnesses during the arrest of Steve McNeil. (Id. at 81). The testimony of those present when the alleged consent occurred, however, was unanimous: McDaniels agreed to a search. (Id. at 77). Whether she agreed to a search of the house or not does not matter, however, since the testimony is shows that the only evidence discovered before the issuance of the search warrant was the marijuana that McDaniels herself provided police.

Penn Ave. address.  The court will deny the motion to suppress the search at 90

Penn Ave.[2]

### c.  The Search Warrant at 97 Metcalf Street

Defendant also seeks suppression of the evidence seized at 97 Metcalf Street,

where he resided with his brother.  Defendant contends that the statements he made

to Agent Langan, along with evidence seized from the Penn Avenue home, provided

the basis for the warrant issued to search 97 Metcalf.  This evidence was improperly

included in the warrant application and provided the probable cause for issuing that

warrant.  Without that evidence, defendant contends, a judge would not have issued

the warrant.

Unlike the search at the other residence, defendant does not allege that the

search at 97 Metcalf St. occurred before officers obtained a warrant.  Instead, he

---

[2]Though the government did not raise the argument in its brief or at the hearing, the court is also uncertain that defendant would have standing to challenge the seizure of any evidence from 90 Penn Ave.  The evidence does not indicate that Defendant Adolphus McNeil resided at that address or that he ever spent any time there.  The evidence indicates only that Steve McNeil and Colleen McDaniels lived at that address.  "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."  Rakas v. Illinois, 439 U.S. 128, 131 n.1 (1978).  The Supreme Court has held that "'it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the [exclusionary] rule's protections.'"  United States v. Salvacci, 448 U.S. 83, 87 (1980) (quoting Rakas, 439 U.S. at 134).   Moreover, "the extent to which the Fourth Amendment protects people may depend upon where those people are.  We have held that 'capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded space.'"   Minnesota v. Carter, 525 U.S. 83, 88 (1998) (quoting Rakas, 439 U.S. at 143).  No evidence presented here indicates that defendant had a legitimate expectation of privacy in his brother's home.

challenges the sufficiency of the affidavit of probable cause used to obtain the warrant. The Fourth Amendment establishes that "'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons to be seized.'" Groh v. Ramirez, 540 U.S. 551, 557 (2004). "The threshold requirement for issuance of a warrant is probable cause." United States v. Ritter, 416 F.3d 256, 262 (3d Cir. 2005). In determining whether probable cause to issue a warrant exists, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Thus, "a court considering the sufficiency of an agent's affidavit [must] look at the 'totality of the circumstances,'" to determine whether "common sense" dictates issuing a warrant. Ritter, 416 F.3d at 262. A court reviewing that determination has a duty "simply to ensure that the magistrate had a "substantial basis for . . . [concluding]" that probable cause existed. Gates, 462 U.S. at 238-39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)). Defendant contends that some of the evidence on which the affidavit relies was obtained in an unconstitutional manner, and should not be considered. In that instance, "the inclusion of illegally obtained evidence does not vitiate a search warrant which is otherwise validly issued upon probable cause reflected in the

17

affidavit based on proper sources." <u>United States v. Sterling</u>, 369 F.2d 799, 802 (3d Cir. 1966).

The search warrant issued for 97 Metcalf St. In Wilkes-Barre, Pennsylvania contains an affidavit of probable cause from Trooper Scott E. Hawley. (<u>See</u> Govt's Exh. 4). The only evidence seized from the Penn Ave. home mentioned in the affidavit is the marijuana that Steve McNeil's girlfriend allegedly gave to police, telling them that Steve McNeil had left it on the table. (<u>Id.</u>). The affidavit describes the course of officer's investigation. (<u>Id.</u>). It relates that Police in Illinois stopped David and Da[i]nty Williams on April 11, 2008, searched their car, and discovered around 70 pounds of marijuana. (<u>Id.</u>). David Williams and his wife told police that they had contracted with Steve McNeil to drive from Wilkes-Barre to Las Vegas, Nevada, where they would meet him. (<u>Id.</u>). McNeil would then use the Williamses's car to drive to Arizona and pick up marijuana from a man known as "Jose." (<u>Id.</u>). McNeil then returned to Las Vegas, turned the car and marijuana over to David and Dainty Williams, and flew home. (<u>Id.</u>). The Williams would then drive the load across the county to Pennsylvania, where they would meet Steve McNeil. (<u>Id.</u>). He paid them $100 a pound for delivering the marijuana. (<u>Id.</u>). The Williamses told troopers that McNeil lived at 90 Penn St. in Kingston, Pa and owned another home at 97 Metcalf St., where his brother lived. (<u>Id.</u>). Williams knew Steve McNeil's brother as "Flash." (<u>Id.</u>). Detective Joe Coffay reported that he had received complaints about drug activity at both homes over the previous several months.

(Id.).  In addition, the affidavit noted that Steve McNeil had a lengthy criminal history in several states, including a history of drug possession and delivery crimes.  (Id.).

The affidavit also related that officers arranged a controlled delivery of the marijuana seized from David and Dainty Williams.  (Id.).  McNeil picked up the load of marijuana on April 12, 2008 at 6:30 p.m.  (Id.).  Officers from the Pennsylvania State Police and the Drug Enforcement Agency followed McNeil to 90 Penn Ave. in Kingston, where they took him and two bags of marijuana into custody.  (Id.).  The affidavit further reported that Collen McDaniel, who owned the home and the car McNeil was driving, told police that Steve McNeil occasionally visited 90 Penn Ave. to see his children, but stayed mainly at 97 Metcalf Street in Wilkes-Barre with his brother.  (Id.).  She also told police that Steve McNeil's brother uses the name "Flash."  (Id.).

The affidavit contains additional information about the 97 Metcalf St. residence.  (Id.).  David Williams told investigators that he had frequently visited that location over the previous three weeks with Steve McNeil.  (Id.).  He observed individuals smoking marijuana there, and had purchased drugs at the home.  (Id.).  Detective Joe Coffay also reported that he had received many complaints about the a high volume of foot traffic at 97 Metcalf St.  (Id.).  Finally, the affidavit describes the detention of Adolphus McNeil and his statement to police that there was approximately ½ pound of marijuana in the home.  (Id.).

The court finds that the information contained in the warrant provided the

magistrate with a substantial basis for concluding that probable cause existed for issuing the warrant. The court has determined that the evidence in the warrant challenged by the defendant–his statements to police and the marijuana recovered from 90 Penn Ave.–was properly attained and can be considered in determining whether the warrant contains probable cause. The warrant affidavit contains information that Steve McNeil was involved in a substantial drug trafficking operation. Police had reportedly watched him take delivery of more than seventy pounds of marijuana. The same informants who had lead Police to Steve McNeil reported that drug use and drug trafficking activity took place at 97 Metcalf Avenue. Police had also received other reports of substantial foot traffic and complaints of possible drug trading at the home. The court finds that this information, in itself, provided the magistrate with probable cause to believe that contraband would be discovered at the residence. Even if the court were to exclude the statements in the affidavit of probable cause challenged by the defendant, the warrant would still be valid. The defendant's motion will be denied on these grounds.

### c. Receipt

Defendant also argues that the search of 97Metcalf Street should be suppressed. The search, defendant claims, violated Rule 41(f)(1)(C) of the Federal Rules of Criminal Procedure. That rule requires "a copy of the warrant and a receipt for the property taken" be given to the person from whom the property was seized. A search of defendant's personal effects at the detention center does not

demonstrate that a copy of the warrant and return was among his belongings.

Trooper Christopher McGuire testified at the hearing that he performed the search at 97 Metcalf Street, discovering marijuana, a large amount of cash, and a rifle. (N.T. at 71). He did not perform the search until after the search warrant had been issued. (Id.). When he completed the search he left a copy of the warrant and an inventory receipt at the residence. (Id. at 71). No other witness challenged this testimony.

The court will deny the motion to suppress on these grounds as well. The testimony at the hearing on defendant's motions indicates that officers left a copy of the warrant and an inventory receipt as required by the Federal Rules. The fact that these documents were not on the defendant's person after he was taken into custody is not material to the question of whether they were left at his residence, especially since no testimony indicates that defendant returned to his home after officers initially took him into custody. In any case, failure to provide the copy of the warrant and return are mere administrative acts that do not affect the validity of the search itself. The Third Circuit has found that if the search itself was valid failure to follow the warrant return requirement "is not 'constitutionally significant' under the Fourth Amendment and does not automatically require suppression. United States v. Hall, 505 F.2d 961, 963 (3d Cir. 1974). Instead, a violation of the return rule should lead to suppression "only when the defendant demonstrates prejudice from the . . . violation." Id. at 964. Defendant has made no showing of prejudice from the

alleged failure to provide a copy of the warrant to defendant, and the court will not suppress the evidence on these grounds.

### d. Warrant Not Sealed

Defendant also contends that the warrants should be suppressed because they were never sealed by the issuing authority and were thus invalid. He offers no legal authority to support his argument. The evidence at the suppression hearing indicates that defendant is mistaken in his claim that the warrants were not properly sealed. At the suppression hearing the government introduced into evidence–without objection from the defendant– copies of both search warrants at issue here. Testimony indicates that the original search warrant for the home at 90 Penn Avenue, Kingston, Pennsylvania, obtained from the state police file bears two raised seals next to the signature of the magistrate who issued the warrant. (N.T. at 16-17; See Government's Exh. 3). Testimony also establishes that the warrant for 97 Metcalf Street, also signed by Magistrate Barilla of Swoyersville, PA, contains the two raised seals next to the magistrate's signature. (N.T. at 18; See Government's Exh. 4). Because the warrants were sealed, the court will deny the motion on these grounds. In any case, the warrant would be valid under Pennsylvania law even if a seal were not attached to it, as courts have found that any requirement to seal a warrant is merely "magisterial in nature so that its dispensation is not fatal to an otherwise properly prepared (in form and substance) search warrant."

<u>Commonwealth v. Peticca</u>, 585 A.2d 1065, 1066 (Pa. Super. Ct. 1991).[3]

**Conclusion**

For the reasons stated above, the defendants' motions to suppress evidence will be denied.  An appropriate order follows.

---

[3]In any case, the requirements for a warrant appear to have changed, and the defendant may be mistaken that a seal is required.  The current rule provides that "[e]ach search warrant shall be signed by the issuing authority."  PA. R. CRIM. P. 205.  The previous rule stated that "[e]ach search warrant shall be signed *and sealed* by the issuing authority."  <u>Pettica</u>, 585 A.2d at 1066 (quoting PA. R. CRIM. P. 2005) (emphasis added).  Still, the warrant was sealed, and so this apparent rule change does not matter in this case.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **No. 3:09cr320** |
| | **:** | |
| | **:** | **(Judge Munley)** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **ADOLPHUS MCNEIL,** | **:** | |
| **Defendant** | **:** | |

## <u>ORDER</u>

**AND NOW**, to wit, this 19th day of January 2010, the defendants' motions to suppress (Docs. 19, 48) are hereby **DENIED**.

**BY THE COURT:**

s/ James M. Munley
**JUDGE JAMES M. MUNLEY**
**UNITED STATES DISTRICT COURT**